1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

10  ROBERT MEJIA GRACIA,                    1:10-CV-00273 GSA HC

11                    Petitioner,           ORDER DENYING PETITION FOR WRIT OF
                                            HABEAS CORPUS
12          v.
                                            ORDER DIRECTING CLERK OF COURT TO
13                                          ENTER JUDGMENT FOR RESPONDENT
    F. HAWS, Warden,
14                                          ORDER DECLINING ISSUANCE OF
                      Respondent.           CERTIFICATE OF APPEALABILITY
15  _____/

16

17          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18  pursuant to 28 U.S.C. § 2254.  The parties have consented to the jurisdiction of the magistrate

19  judge pursuant to 28 U.S.C. § 636(c).

20                                  **BACKGROUND**[1]

21          Petitioner is currently in the custody of the California Department of Corrections pursuant

22  to a judgment of the Superior Court of California, County of Tulare, following his conviction by

23  jury trial on July 13, 2007, of five counts of forcible oral copulation (Cal. Penal Code

24  § 288a(c)(2)), one count of kidnapping to commit forcible sex crimes (Cal. Penal Code

25  § 209(b)(1)), and one count of forcible rape (Cal. Penal Code § 261(a)(2)).  The trial court

26  reduced the forcible rape conviction to assault with intent to commit rape.   Petitioner was

27  sentenced to seven years plus six consecutive 25 years-to-life terms in state prison.

28
    _____

    [1] This information is derived from the petition, the answer, and the exhibits lodged with the answer.

Petitioner filed a timely notice of appeal.  On March 27, 2009, the California Court of

Appeal, Fifth Appellate District ("Fifth DCA"), remanded the case to the superior court to: strike

the one-year prior prison term for the prior burglary conviction: stay the sentence for kidnapping;

and determine whether the previously stayed count of forcible oral copulation should be

reinstated.  Judgment was affirmed in all other respects.  Petitioner then filed a petition for

review in the California Supreme Court.  The petition was summarily denied on June 17, 2009.

On February 18, 2010, Petitioner filed the instant federal habeas petition.  He presents the

following claims: 1) He alleges the trial court abused its discretion by denying his post-

conviction Marsden[2] motion, because Petitioner had presented sufficient proof of ineffective

assistance of counsel; 2) He contends the evidence is insufficient to support the convictions; and

3) He alleges the prosecution failed to prove all elements of the offense of kidnapping with intent

to commit sexual offenses.  On June 21, 2010, Respondent filed an answer to the petition.

Petitioner did not file a traverse.

## STATEMENT OF FACTS[3]

On October 8, 2006, Heather M., Samantha S., and Melina C. were standing
outside an outreach shelter in Tulare when Samantha received a phone call. Shortly
thereafter, a van pulled up, driven by a man named Johnny. Appellant was in the
passenger seat.

The girls thought they were on their way to a hotel room to "get high." While in
the van, appellant told Samantha that she "owed him." Appellant asked Heather if she had
any knowledge of computers, as appellant explained that he needed to steal money from
certain accounts and was having trouble with the person who was supposed to help him
do so. Appellant also asked Heather if she knew how to make fraudulent checks. Heather
told appellant she knew a lot about computers.

Appellant asked Heather if she was a Bulldog gang member. He told her she
"look[ed] good, and he would have fun with [her]." Appellant stated that it would not be
good if Heather was a Bulldog gang member because he was a Norteno gang member.
Heather noticed that the van was headed out of town and she became afraid. She asked
appellant where they were going, but he said not to worry.

They eventually arrived at Benito Munoz's garage in Porterville. The metal door
to the garage was broken. To open it required manually lifting the heavy garage door and
propping it up with a bucket filled with dirt and cement. To enter or leave the garage

---

[2]People v. Marsden, 2 Cal.3d 118 (1970).

[3]The summary of facts is adopted from the opinion of the Fifth DCA and is presumed correct. 28 U.S.C.
§ 2254(e)(1).

required crawling under the door through the low opening. There were two couches in the garage.

Once in the garage, appellant asked Heather if she was afraid. Appellant told Samantha to tie up Heather. Samantha complied and tied Heather's feet and hands with her shoelaces and used a belt to connect her hands and feet. Appellant again asked Heather if she was afraid. Johnny and Munoz were also in the garage.

Appellant removed Heather's sweatshirt, lifted her T-shirt and bra, grabbed her breasts, and pinched her nipples. Appellant told Samantha to untie Heather, which she did.

Appellant then grabbed Heather's arm and took her outside. He pinned her against the fence, tried to kiss her, and accused her of being a cop and wearing a wire. Heather told appellant she was not a cop, and he insisted she prove it by doing what he ordered. He told her that if she was a cop she would "end up in a field in Pixley." He further told Heather he would "represent" her, meaning he was going to initiate her into his gang. Heather told appellant she would do whatever he wanted with computers if he did not hurt her.

Appellant brought Heather back into the garage where Samantha took Heather's identification and social security card out of her purse and gave them to appellant. Appellant said he would hold onto her identification because it had her name and address on it. Heather did not struggle because there were seven gang members in the garage at that time.

Appellant left with Melina, and the other men in the garage drank alcohol and smoked methamphetamine. Heather also smoked methamphetamine.

While in the garage, Heather saw a lead pipe. Munoz had a handgun wrapped in duct tape. Munoz pointed the gun at Heather and explained that after he used the gun, he would peel off the duct tape to remove fingerprints.

Heather told appellant that her mother called each day to check on her at the shelter and that she would know something was not right if Heather was not back soon. Appellant decided to take Melina back to the shelter and have her answer the phone and lie to Heather's mother if she called.

That night, Heather and Munoz went to a gaming casino where Heather played the slot machines for about 30 minutes.

The next morning, Samantha said she owed appellant money and needed to go back to Tulare to get some credit cards and checks. Appellant drove Heather, Samantha, and Melina back to Tulare to drop off Melina. At the shelter, appellant told Heather to get her belongings and to look for checkbooks and checking account numbers there. He warned her that if she did not come back, he would hurt Samantha. While at the shelter, Heather told Melina that if she did not call her later that day, Melina should call the police. When Heather returned without any checkbooks or account numbers, appellant and Samantha were mad. They took Heather back to Porterville.

Once back at the garage, appellant insisted that Heather orally copulate him or he would kill her. He also said he would kill her entire family. At one point, appellant slapped her face "really hard." Heather resisted, but after he threatened her again, she orally copulated appellant.

That afternoon, Heather overheard appellant tell people on the phone that he had a girl they could use sexually for money or drugs. Munoz's brother Steven arrived later that afternoon. Appellant told Heather to orally copulate Steven. When she said no, appellant hit her and said he would kill her. Heather screamed and both appellant and Samantha yelled at her and told her to cooperate if she wanted to live. Samantha also slapped Heather in the face. Eventually, Heather orally copulated Steven. Heather saw Steven give appellant $50 and give Munoz some "dope."

After Steven left, the garage door was open and Heather tried to scream. But appellant tackled her and choked her. He then insisted that she again orally copulate him, which she did.

Munoz told Heather that he liked to "bump and run," which he described as when he would drive down the street, see an attractive female, clip her with a car, put her into the back seat, take her to the garage, and tie her up and rape her. Appellant and Munoz laughed, and appellant said he had done this to three girls he had assaulted in the garage for long periods of time.

Later that day, appellant brought Robert Gonzales, or ET as he was known, and told Heather she had to have sex with him. When appellant left Heather and Gonzales in the garage, Heather begged Gonzales to leave her alone. Gonzales told Heather not to worry, that he was not going to do anything to her and would not tell appellant. When appellant came back to the garage and asked if they were through, Gonzales said they were and left.

Appellant then left Heather with Munoz. Heather begged Munoz to let her go home. Munoz said he did not like the situation because his wife would find out, but that it was appellant's "thing" and he had no control over it.

Appellant came back and told Heather to orally copulate Munoz, and he threatened to kill her if she didn't. Appellant took Heather into Munoz's house. Heather cried and pleaded and told Munoz she wanted to leave, but Munoz again responded that this was appellant's "thing." Heather then orally copulated Munoz.

Appellant later took Heather to Munoz's bedroom and told her to have intercourse with Munoz. Heather told Munoz she did not want to have sex with him, but by this time "begging and pleading wasn't getting anywhere," and she was afraid they would kill her. Munoz undressed Heather, who was crying, laid her on the bed, held her down by her arms, and placed his penis into her vagina.

Appellant took Heather back to the garage where Samantha gave her a couple of pills to make her sleep. Heather laid down on the couch while appellant and Samantha had sex next to her. Appellant tried to take Heather's pants off several times, but Heather was able to keep him from doing so. The three then went to sleep.

The next morning, appellant heard noises and thought the police were coming. He told Heather and Samantha to hide. After 10 minutes, appellant said he needed more drugs, so he took Heather's rings, called someone, and sold the rings for $50.

Appellant, Munoz, Samantha, and Heather then went in Munoz's car to look for drugs in Porterville. After buying drugs, the four returned to the garage where they all got high on methamphetamine. Appellant told Samantha to inject Heather with drugs so that she could perform better sexually. Heather did not protest as she did not care what happened to her at this point. Samantha injected her seven times with methamphetamine.

Appellant then told Heather that if she helped him steal money from some bank accounts, he would let her go home. Appellant and Munoz brought in two computers with missing parts and told Heather to get them working.

Heather told appellant and Munoz she needed to get a computer program from her friend Brett who lived in Fresno. Appellant called Brett and told him that he would kill Heather if Brett did not bring him some software. Appellant and Munoz agreed to meet with Brett in Fresno, but Heather later convinced them not to, as Brett would probably contact the police. Heather persuaded appellant to call Brett so that he would not be suspicious. Appellant took Heather and Samantha to a pay phone at a Save Mart. While walking, Heather noted for the first time that the garage was on Wisconsin Street.

At the pay phone, Samantha called Brett. When Samantha said she needed quarters, appellant gave Heather $2 to go into Save Mart to get them. Once in the store, Heather wrote a note saying she was kidnapped by Nortenos on Wisconsin Street. She included her full name and her mother's telephone number. She gave the note to a cashier and told her it was not a joke. Appellant then motioned for Heather to come over to him. The cashier in turn gave the note to her manager.

Police detective Brian Clower responded to Save Mart and reviewed the store's surveillance tape. He and another officer then went door to door looking for the suspects. They eventually saw appellant and Munoz get into a vehicle and drive away. Detective Clower initiated a traffic stop and detained appellant and Munoz. One of the two told Detective Clower that the female in the surveillance tape was in the garage.

Detective Clower and other officers arrived at the garage. They had a difficult time opening the garage door and had to "break it, basically." Heather ran to one of the officers and told him she needed to get out of there and make sure her family was safe.

Detective Sonia Silva spoke to Melina a few days later. Melina told her that appellant wanted to beat up Samantha and that she and Heather agreed to help Samantha by making fraudulent checks and money transfers. Melina told Detective Silva they were all having a good time until they wanted to go home and were not allowed to. According to Melina, she was allowed to return to the shelter because she was "no use to them" and she could cover for Heather and Samantha's absence from the shelter. She said that Heather had told her back at the shelter that she did not want to go back to Porterville and that, when Heather had asked appellant if she could go home, he had said no. But at trial, Melina testified that the girls were all free to go, and she denied telling Detective Silva that Heather felt threatened.

Detective Silva spoke to Gonzales, who told her that Heather was crying and being mistreated. Gonzales heard appellant yell at Heather because she did not want to have sex with appellant.

Detective Silva spoke to Samantha, who told her appellant was mean to Heather, yelled at her, and forced her to have oral sex. Samantha said she was afraid for her life and that appellant had threatened her family. She confirmed that Steven Munoz "paid her" $50 worth of methamphetamine so he would receive oral sex from Heather. Samantha told Detective Silva she had also been sexually assaulted by appellant.

But at trial, Samantha testified that she willingly had sex with appellant and that no one physically forced Heather to perform oral sex. Instead, Samantha claimed, "they just told [Heather]" to do it and she did. Samantha acknowledged that she did tie up Heather, but claimed it was done in fun because Heather wanted to see if she could get loose. Samantha claimed to have lied when she told Detective Silva that Heather was

1    threatened and when she stated that she was afraid for her life.

2         Heather had only known Samantha one day before they were taken to the garage.
     She did not know appellant or Munoz prior to the events in question. Heather testified
3    that she did not willingly do anything sexual with appellant, Munoz, or Steven to get
     methamphetamine.
4
          Heather was examined by a sexual assault response team nurse. DNA samples
5    were taken from appellant and Munoz and compared to samples taken from Heather's
     clothing and body. Neither appellant nor Munoz could be eliminated as the source of
6    DNA found on several items of Heather's clothing.

7         Steven Munoz testified for the defense that he went to his brother's garage to visit.
     He claimed that when he brought out a bag of methamphetamine, Heather told him she
8    gave good "blow jobs." The two made a deal to trade the drugs for oral sex. Steven
     explained that he originally lied to the police and denied he received oral sex because he
9    did not want his wife to find out.

10        Munoz's next door neighbor, Rocio Lamas, testified that she saw two females
     around Munoz's apartment in early October of 2006. She described the females as coming
11   and going between the garage and apartment and that they "seemed fine." Lamas did not
     hear anyone scream or call for help.
12
          Jonathan Davidson, who was in custody for receiving a stolen vehicle, testified
13   that he knew Heather and took her to an Alcoholics Anonymous meeting in February of
     2007, three months after the incident. In January of 2007, Davidson, Heather and
14   Heather's boyfriend, James Silva, were together at a gas station when Heather told him
     she was not raped and "it didn't go down like that." According to Davidson, Heather
15   claimed her friend did not want to leave the garage, so she stayed there with the guys and
     smoked methamphetamine. Davidson thought Heather was "[p]robably" high when she
16   made these statements. Davidson also claimed that Heather told him she falsely reported
     another rape because she was having problems with her husband at the time.
17
          Heather testified in rebuttal that she did not know Jonathan Davidson. She met her
18   boyfriend a month after the incident. Heather last attended an Alcoholics Anonymous
     meeting in 2005. Heather had been drug testing since October of 2006 and had not tested
19   positive.

20                                  **DISCUSSION**

21   I.   Jurisdiction

22        Relief by way of a petition for writ of habeas corpus extends to a person in custody

23   pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

24   or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

25   529 U.S. 362, 375 n.7 (2000).  Petitioner asserts that he suffered violations of his rights as

26   guaranteed by the U.S. Constitution.  He was convicted in Tulare County Superior Court, which

27   is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

28        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

                                        6

of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114

F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct.

1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

(1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.    Standard of Review

        The instant petition is reviewed under the provisions of the Antiterrorism and Effective

Death Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63,

70 (2003).  Under the AEDPA, a petitioner can prevail only if he can show that the state court's

adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

        As a threshold matter, this Court must "first decide what constitutes 'clearly established

Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

*quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this

Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

of the time of the relevant state-court decision."  Id., *quoting* Williams, 592 U.S. at 412; see also

Harrington v. Richter, __ U.S. __, 131 S.Ct. 770, 785 (2011). "In other words, 'clearly established

Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the

Supreme Court at the time the state court renders its decision." Lockyer, 538 U.S. at 71.

        Finally, this Court must consider whether the state court's decision was "contrary to, or

involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at

72, *quoting,* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may

1  grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]

2  Court on a question of law or if the state court decides a case differently than [the] Court has on a

3  set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S.

4  at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the

5  state court identifies the correct governing legal principle from [the] Court's decisions but

6  unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

7       "[A] federal court may not issue the writ simply because the court concludes in its

8  independent judgment that the relevant state court decision applied clearly established federal

9  law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411;

10 see also Harrington, 131 S.Ct. at 785. A federal habeas court making the "unreasonable

11 application" inquiry should ask whether the state court's application of clearly established federal

12 law was "objectively unreasonable." Williams, 529 U.S. at 409. "A state court's determination

13 that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could

14 disagree' on the correctness of the state court's decision." Harrington, 131 S.Ct. at 786, *quoting*,

15 Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Further, "it is not an unreasonable

16 application of clearly established Federal law for a state court to decline to apply a specific legal

17 rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. __,

18 __, 129 S.Ct. 1411, 1413-14 (2009). "Under 2254(d), a habeas court must determine what

19 arguments or theories supported or, . . . could have supported, the state court's decision; and then

20 it must ask whether it is possible fairminded jurists could disagree that those arguments or

21 theories are inconsistent with the holding of a prior decision of [the Supreme] Court."

22 Harrington, 131 S.Ct. at 786. Only "where there is no possibility fairminded jurists could

23 disagree that the state court's decision conflicts with [the Supreme] Court's precedents" may the

24 writ issue. Id.

25       Petitioner has the burden of establishing that the decision of the state court is contrary to

26 or involved an unreasonable application of United States Supreme Court precedent. Baylor v.

27 Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the

28 states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

state court decision is objectively unreasonable.  See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

III.    Review of Claims

A.  Ground One

Petitioner first alleges the trial court abused its discretion in denying Petitioner's post-conviction Marsden motion since he had made a sufficient showing of a possible motion for new trial based on ineffective assistance of counsel.

Petitioner raised this claim on direct appeal to the Fifth DCA.  The Fifth DCA rejected the claim in a reasoned opinion.  He then presented the claim in a petition for review to the California Supreme Court where it was summarily denied.  When the California Supreme Court's opinion is summary in nature, the Court must "look through" that decision to the court below that has issued a reasoned opinion.  Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3 (1991).  The appellate court denied the claim as follows:

> *Did the trial court err when it denied appellant's postconviction motion for substitution of counsel?*
>
> Following jury selection, appellant requested a *Marsden* hearing, claiming his attorney, Stephen Girardot, had not met with him since the last time they appeared in court together and appellant was not informed of his trial strategy. Following a hearing, the court denied the motion.
>
> Prior to sentencing, appellant requested a second *Marsden* hearing, claiming he was not "represented to the fullest by counsel." Following a hearing, the court denied the motion. Appellant then asked that he be able to file a motion for a new trial with substitute counsel, based on ineffective assistance. The court denied appellant's request, stating that it had spent some time with the parties in camera and had found no ineffective

assistance of counsel.

Appellant now contends that the trial court abused its discretion amounting to reversible error when it denied his second *Marsden* motion, because appellant "made a sufficient showing that he was denied his constitutional right to effective assistance of counsel." We disagree.

The law is well established that, when a defendant makes a *Marsden* motion after conviction, seeking the appointment of new counsel because of purported inadequate representation, the trial court must give the defendant the opportunity to explain his or her reasons for the request. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085 (*Barnett*); *People v. Smith* (1993) 6 Cal.4th 684, 694 (*Smith*); *Marsden, supra,* 2 Cal.3d at pp. 123-125.) As in preconviction *Marsden* motions, after considering "any specific examples of counsel's inadequate representation that the defendant wishes to enumerate [,] ... substitution is a matter of judicial discretion." (*People v. Webster* (1991) 54 Cal.3d 411, 435; cf. *Smith, supra,* at pp. 694-697.) Moreover, as our Supreme Court noted in *Smith:* "It is the very nature of a *Marsden* motion, at whatever stage it is made, that the trial court must determine whether counsel has been providing competent representation. Whenever the motion is made, the inquiry is forward-looking in the sense that counsel would be substituted in order to provide effective assistance in the future. But the decision must always be based on what has happened in the past." (*Id.* at pp. 694-695, italics omitted.)

"'''A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citations].' [Citations]." '[Citation.]" (*Barnett, supra,* 17 Cal.4th at p. 1085.) The denial of new counsel "'is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would "substantially impair" the defendant's right to assistance of counsel. [Citations.]' [Citation.]" (*Ibid.*)

Here, at the trial court's behest, appellant expressed a variety of concerns: he mentioned witnesses he believed should have been called; questions that should have been asked of the victim; his desire to take the stand because he wanted to show "the true facts in this case"; a change of venue due to the bad publicity in this case; and the fact that counsel never talked to him, had only seen him at trial, and had not informed him of trial strategy.

The trial court then questioned appellant on specifics. Appellant revealed that the witnesses he wanted to call were his uncle Ricardo Creato, who was present when the events occurred, and Johnny Hernandez, the driver of the vehicle when the girls were picked up. Appellant said that he had given the investigator a letter which should have been passed on to his attorney, but the attorney never mentioned it. Appellant also claimed that, when he made "those calls," [FN4] he wasn't trying to get software, but a check "because we were all broke." Appellant stated that he didn't think he had had a chance to explain to his attorney what had happened. Appellant also claimed that the victim had mental health issues, indicated by her constant crying, which should have been explored.

FN4. Likely referring to the calls made to Heather's friend, Brett Collins.

When asked if he had spoken to his attorney about taking the stand, appellant stated that he had and that they were going to discuss it but had never gotten around to it. Appellant acknowledged that his attorney told him his prior felonies could be used against him if he did so. When asked why he did not inform anyone else that he wished to take the stand, appellant said he trusted his attorney and thought he was doing the best thing for him. Appellant claimed that he discussed his request for a change of venue with

his attorney.

Appellant again mentioned the letter he had given the private investigator. Appellant explained that the letter was written by Samantha and contradicted some of the things she had said on the stand. He complained that he never got "my police report, my paperwork, or anything" until "last Friday." Finally, appellant complained that "this guy James" [FN5] was not questioned about how he knew the victim, which would be indicative of her credibility and "let everyone know what kind of person she was."

FN5. Likely referring to Heather's boyfriend, James Silva.

The trial court then questioned appellant's attorney, Steve Girardot, about appellant's concerns. Girardot stated that he did not know who Ricardo Creato was. He chose not to call Johnny Hernandez (the driver of the van) as a witness because he did not want him to testify that the victim was crying in the car, which he thought was harmful to the defense. Girardot did have a letter from Samantha, but it included the same information she testified to on cross-examination and did not add any new information.

Girardot stated that he and appellant had discussed whether he should testify, and he recommended against it, citing appellant's extensive prior criminal record as the reason. Girardot acknowledged that the court was going to sanitize appellant's crimes, but maintained he did not want the jury to speculate as to what those crimes were. He was especially worried that the jury would think appellant had previously been convicted of sex crimes, assault, or kidnapping.

Girardot then addressed the assertion that he had not been in contact with appellant.

"As far as visiting with [appellant], I never went to see [appellant]. I spoke with him here and investigators spoke to him in jail. I didn't see a reason to speak with him. I didn't see a reason to share my trial tactics with [appellant]. It may have made [appellant] feel better and that is probably something I should have taken into consideration, but I was here to defend [appellant] the best way I saw fit, within the law, and I think I did that."

When questioned on why he had not pursued the victim's mental health issues, Girardot explained that allowing evidence of a victim's mental health was difficult and, in this case, not relevant. Instead, Girardot thought that the victim's drug issue was the "crux of the case." The trial court stated that, in its recollection, there was information that the victim made a suicide attempt after the incident, which did not necessarily help the defense.

Finally, Girardot explained that a change of venue was discussed with a prior attorney in the case. Although there was some bad publicity, Girardot did not think it impossible to find a fair and impartial jury. Girardot explained that the jurors were questioned about their prior knowledge of the case, and no sitting juror knew about the case prior to trial. The court agreed with Girardot's statement concerning the jurors and that this case was not so highly publicized that a change of venue was warranted. The court specifically mentioned that it could recall only one, maybe two, change of venue motions that had been granted in the county in the past 30 years.

The trial court then denied appellant's motion, stating that Girardot had done a very good job at trial. "He was incisive with the witnesses, he got the good points out, and he argued the case as well as I have seen an argument.... I don't think there's anything that I can say that your lawyer did anything other than what a good lawyer would do."

At this point in the proceedings, the trial court had before it not only appellant's complaints, but Girardot's explanations, as well as the trial evidence. Appellant failed to show that Creato, Hernandez, Samantha's letter, or Heather's mental state would have provided any exculpatory evidence.

As for appellant's claim that he wanted to testify in his own behalf, "[a]lthough normally the decision whether a defendant should testify is within the competence of the trial attorney [citation], where ... a defendant insists that he wants to testify, he cannot be deprived of that opportunity." (*People v. Robles* (1970) 2 Cal.3d 205, 215.) But, "[w]hile the defendant has the right to testify over his attorney's objection, such right is subject to one significant condition: The defendant must timely and adequately assert his right to testify. [Citation.] Without such assertion, '... a trial judge may safely assume that a defendant who is ably represented and who does not testify is merely exercising his Fifth Amendment privilege against self-incrimination and is abiding by his counsel's trial strategy.' [Citations.]" (*People v. Hayes* (1991) 229 Cal.App.3d 1226, 1231.) Here it appears that appellant did, in fact, acquiesce in his attorney's advice not to testify. He made no assertion of the right and, when the record fails to show such a demand, a defendant may not await the outcome of the trial and then seek reversal (or a new trial) based on the claim that, despite expressing to counsel the desire to testify, the defendant was deprived of that opportunity. (*People v. Guillen* (1974) 37 Cal.App.3d 976, 985.)

Finally, based on the statement of the trial court, a motion for change of venue would likely have been denied.

Applying the deferential standard to the trial court's ruling on appellant's second *Marsden* motion, we conclude that, from all of the circumstances before it, including Girardot's performance at trial, the trial court was entitled to find that counsel conducted the necessary investigation and, for strategic reasons, decided not to call certain witnesses or make a change of venue motion. (*Smith, supra,* 6 Cal.4th at p. 696.) We find no abuse of discretion.

Respondent correctly argues that Petitioner's claim fails to present a cognizable ground for relief on federal habeas review.  In essence, Petitioner challenges the trial judge's application of People v. Marsden, 2 Cal.3d 118 (1970), in addressing his post-conviction motion for new counsel.  The interpretation and application of state laws are generally not cognizable on federal habeas. Estelle v. McGuire, 502 U.S. 62, 67, (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "), *quoting* Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas"); Sawyer v. Smith, 497 U.S. 227, 239 (1990), *quoting,* Dugger v. Adams, 489 U.S. 401, 409 (1989) ("[T]he availability of a claim under state law does not of itself establish that a claim was available under the United States Constitution").  In addition, federal courts are bound by state court rulings on questions of state law. Oxborrow v. Eikenberry, 877

1    F.2d 1395, 1399 (9th Cir.), *cert. denied*, 493 U.S. 942 (1989).  The Ninth Circuit has stated that

2    the denial of a motion to substitute counsel implicates a defendant's Sixth Amendment right to

3    counsel, Bland v. California Dept. of Corr., 20 F.3d 1469, 1475 (9th Cir. 1994), and the Sixth

4    Amendment requires an inquiry into the grounds for a motion to remove defense counsel, Schell

5    v. Witek, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc); however, there is no direct precedent

6    from the Supreme Court holding that a denial of a motion to relieve defense counsel can be

7    unconstitutional.  "[I]t is not an unreasonable application of clearly established Federal law for a

8    state court to decline to apply a specific legal rule that has not been squarely established by [the

9    Supreme] Court." Knowles, 129 S.Ct. 1411, 1413–14.  Therefore, Petitioner's allegation that the

10   trial court erred in denying his motion to remove counsel does not present a cognizable claim on

11   habeas review.

12        To the extent Petitioner claims he was denied the effective assistance of counsel by the

13   trial court's decision, it is clear from the record that the state court ruling was not contrary to or

14   an unreasonable application of Supreme Court precedent.

15        The law governing ineffective assistance of counsel claims is clearly established.  Canales

16   v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging

17   ineffective assistance of counsel, the court must consider two factors.  Strickland v. Washington,

18   466 U.S. 668, 687 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner

19   must show that counsel's performance was deficient, requiring a showing that counsel made

20   errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth

21   Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation

22   fell below an objective standard of reasonableness, and must identify counsel's alleged acts or

23   omissions that were not the result of reasonable professional judgment considering the

24   circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).

25   Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair

26   trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  Judicial scrutiny of counsel's

27   performance is highly deferential.  A court indulges a strong presumption that counsel's conduct

28   falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. 668, 687

13

1   (1984); <u>Sanders v. Ratelle</u>, 21 F.3d 1446, 1456 (9th Cir.1994).

2       Second, the petitioner must demonstrate prejudice, that is, he must show that "there is a

3   reasonable probability that, but for counsel's unprofessional errors, the result ... would have been

4   different," 466 U.S. at 694.  A court need not determine whether counsel's performance was

5   deficient before examining the prejudice suffered by the petitioner as a result of the alleged

6   deficiencies.  <u>Strickland</u>, 466 U.S. 668, 697 (1984).  Since the defendant must affirmatively

7   prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

8       In this case, the trial court considered Petitioner's claims of ineffective assistance and

9   determined that defense counsel had performed admirably throughout the trial.  Additionally,

10  none of Petitioner's complaints of ineffectiveness had any merit.

11      Petitioner claimed counsel failed to call Petitioner's uncle, Richard Creato, who he said

12  was present at the time of the events.  However, Petitioner does not state what would have been

13  Creato's testimony or how that testimony would have assisted the defense.  Moreover, defense

14  counsel stated he was not aware of Creato, and Creato was unknown to the prosecution and

15  unmentioned in any reports.

16      Petitioner also claimed defense counsel should have called Johnny Hernandez, the driver

17  of the van who picked up Samantha and the victim, as a witness. However, defense counsel

18  advised the trial court he decided not to call Hernandez because his testimony would have been

19  cumulative to Samantha's testimony, and more importantly, counsel believed additional

20  testimony of the victim crying would have been more harmful to the defense than anything.  This

21  strategy was sound, considering the defense theory was that the victim was not forced to do

22  anything but consented to perform sexual acts.  Additional evidence that the victim was crying

23  would have undermined the defense.

24      Next, Petitioner alleged counsel failed to present evidence in the form of a letter written

25  by Samantha which would have contradicted some of her testimony.  Counsel admitted he had

26  the letter in his files, but the letter provided the same information Samantha testified to on cross-

27  examination and added nothing.

28      Petitioner also claimed counsel failed to cross-examine the victim about mental health

issues.  Defense counsel stated that whether or not the victim had mental health issues was beside the point.  More important to the defense, and what counsel ultimately wanted to present to the jury, was the fact that the victim suffered from a serious drug addiction and would do anything for drugs, including performing sex acts in exchange for drugs.  In addition, the documented suicide attempt by the victim took place after the incident and could very easily have been used by the prosecution as evidence of the mental toll the kidnapping and sexual assaults had on the victim.

Petitioner next argued that counsel failed to meet with him regularly and failed to inform him of trial strategy.  Nevertheless, Petitioner fails to state how this prejudiced him in any way.  Counsel admitted that meeting with Petitioner may have put Petitioner at ease, but stated there was nothing material to be gained by personal visits to Petitioner.  He spoke with him in advance of trial and discussed the case.  His investigators spoke with Petitioner on many occasions, and defense counsel stated he was familiar with all of the evidence.  Petitioner does not state what additional meetings with counsel would have accomplished.  As to counsel's tactics, again, he states further discussion with Petitioner probably would have made Petitioner feel better, but Petitioner fails to show it ultimately would have assisted the defense.

Petitioner alleged counsel should have moved for a change in venue.  Defense counsel responded that there may have been bad press about the case, but there was not so much that a change in venue was necessary to secure a fair and impartial jury.  In fact, the trial court stated that it would not have granted such a motion.

Petitioner also stated he had wanted to testify.  Defense counsel informed the court that he advised Petitioner not to testify due to his extensive criminal background.  Acknowledging that the court would sanitize Petitioner's prior criminal record to crimes of moral turpitude, defense counsel stated he wanted to avoid the jury speculating whether Petitioner's crimes of moral turpitude were in fact prior sex offenses.  Defense counsel opined that the trial had been going well for Petitioner and that Petitioner testifying would not have helped but, because of Petitioner's criminal background, might actually have hurt.

In light of defense counsel's valid and reasonable explanations, Petitioner fails to

demonstrate that the appellate court's rejection of his claim of ineffective assistance of counsel was contrary to or an unreasonable application of the <u>Strickland</u> standard.

## B.  Ground Two

Petitioner next claims there was insufficient evidence to support his convictions.  This claim was also presented on direct appeal to the Fifth DCA where it was rejected in a reasoned opinion.  It was then presented in the petition for review in the California Supreme Court where it was summarily denied.  Therefore, this Court must look through to the Fifth DCA decision. <u>Ylst</u>, 501 U.S. at 804-05 & n. 3.  The appellate court denied the claim as follows:

*Do appellant's convictions violate his due process rights?*

Appellant contends that the judgment of conviction violates his constitutional right to due process. In essence, he argues there is insufficient evidence to uphold his conviction because it is based solely on Heather's uncorroborated testimony which, in turn, was impeached and "so improbable and unbelievable" that no rational trier of fact could believe it. We disagree.

As required, we view the evidence in the light most favorable to the judgment to determine whether the record discloses substantial evidence that is reasonable, credible and of solid value. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129.) It is well settled that any conflict or contradiction in the evidence or any inconsistency in the testimony of witnesses must be resolved by the trier of fact who is the sole judge of the credibility of the witnesses. It is also well settled that one witness, if believed by the jury, is sufficient to sustain a verdict. (*People v. Ozene* (1972) 27 Cal .App.3d 905, 910, disapproved on another point in *People v. Gainer* (1977) 19 Cal.3d 835, 844.) To warrant the rejection by a reviewing court of statements given by a witness who has been believed by the trial court or the jury, "'there must exist either a physical impossibility that they are true, or it must be such as to shock the moral sense of the court; it must be inherently improbable and such inherent improbability must plainly appear.' [Citation.]" (*People v. Jones* (1970) 10 Cal.App.3d 237, 247; *People v. Seals* (1961) 191 Cal.App.2d 734, 738.)

The jury convicted appellant in count 1 of kidnapping for ransom, reward, or extortion, pursuant to section 209, subdivision (a), which provides, in relevant part:

"Any person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away another person by any means whatsoever with intent to hold or detain, or who holds or detains, that person for ransom, reward or to commit extortion or to exact from another person any money or valuable thing ... is guilty of a felony...."

In order to find extortion, the jury had to find that appellant threatened to injure or use force against Heather or a third person; that when making that threat, he intended to use fear or force to obtain the person's consent to give appellant money or property; and that, as a result of the threat or use of force, the person gave appellant the money or property. (§ 518; CALCRIM No. 1830.) Section 209, subdivision (a) "applies where a person is held in order to force a payment of some kind to the perpetrator. [I]t does not require an asportation and therefore can be committed even though no 'kidnapping' occurs within the common law and general usage of that term." (*People v. Ordonez*

(1991) 226 Cal.App.3d 1207, 1227; see also *People v. Greenberger* (1997) 58 Cal.App.4th 298, 367.)

The jury convicted appellant in count 2 of kidnapping to commit forcible sex crimes, pursuant to section 209, subdivision (b)(1), which is defined as kidnapping or carrying away an individual with the intent to commit, inter alia, robbery, rape or oral copulation. The intent must be formed before commencement of the kidnapping, and the asportation must be undertaken with that purpose and intent. (*People v. Isitt* (1976) 55 Cal.App.3d 23, 28.) The movement of the victim must be accomplished by force or any other means of instilling fear. (*People v. Majors* (2004) 33 Cal.4th 321, 327.) And the movement must be "beyond that merely incidental to the commission of, and increase[ ] the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." (§ 209, subd. (b)(2).)

The jury convicted appellant in counts 3, 4, 5, and 6 of oral copulation in violation of section 288a, subdivision (c)(2). That section prohibits oral copulation "when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person...." The prosecutor argued that appellant was an aider and abettor to two of those counts of oral copulation.

And finally, appellant was convicted in count 7, as an aider and abettor, of assault to commit rape in violation of section 220. In order to find appellant guilty of this count, the jury had to find that appellant did an act that by its nature would directly and probably result in the application of force to a person; that he acted willfully; that when he acted, he was aware that his act would directly and probably result in the application of force; that he had the present ability to apply force to the victim; and that he intended to commit rape. (CALCRIM No. 890.)

Here, Heather testified that, when she got into the van with appellant, she thought she was going to a motel room with several people to get high, but was instead taken to the garage. The following day, she was taken from the garage back to the shelter, but forced to return to the garage. Heather testified that she was fearful for her life while she was being transported because appellant had threatened her, threatened to kill her family, and threatened Samantha. Heather testified that appellant forced her into oral sex with him on two occasions and with Munoz and his brother as well. She also testified that appellant forced her to have intercourse with Munoz. Although Heather tried to say no, appellant slapped her across the face, threatened to hit her again, and at various times told her he was going to kill her. After she had oral sex with Steven Munoz, he gave appellant $50. At one point, appellant took Heather's rings, sold them, and bought drugs with the money.

Viewing the evidence, it cannot be said that Heather's testimony was inherently improbable or physically impossible or of such an incredible nature as to shock the moral sense of the court.

Appellant's contention notwithstanding, the testimony of Heather was not uncorroborated. On the contrary, a number of witnesses corroborated large portions of Heather's story. The officers who arrived at the garage found the garage door broken and difficult to open. Detectives Clower and Silva both found Heather shook up and anxious to get out of the garage. Melina told Detective Silva that Heather would be in trouble if she did not cooperate with appellant. Samantha told Detective Silva that appellant had been mean and yelled at Heather, that Heather did not want to be in the garage and was afraid, that appellant had threatened Heather and her family, and that Heather had been sexually assaulted. Gonzales testified that Heather was crying when he saw her in the

garage and that he wanted her to leave with him, but that another woman told appellant what he was trying to do and thwarted his efforts. Brett Collins testified that appellant tried to get $300 from him because Heather owed him money. Although Melina and Samantha recanted their stories on the stand, it is up to the jury to determine the credibility of the witnesses and to resolve any conflict in the evidence.

We reject appellant's claim of a due process violation based on insufficiency of the evidence.

The law on insufficiency of the evidence claim is clearly established. The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). However, when a federal court "undertake[s] collateral review of a state court decision rejecting a claim of insufficiency of the evidence pursuant to 28 U.S.C. § 2254(d)(1), however, our inquiry is even more limited; that is, we ask only whether the state court's decision was contrary to or reflected an unreasonable application of Jackson to the facts of a particular case." Emery v. Clark, __ F.3d __, 2011 WL 2090827 (9th Cir. 2011), citing, Juan H. v. Allen, 408 F.3d 1262, 1274-75 (9th Cir. 2005).

Sufficiency claims are judged by the elements defined by state law. Id. at 324 n. 16. Here, Petitioner was convicted in count one of kidnapping for ransom, reward, or extortion. In count two he was convicted of kidnapping to commit forcible sex crimes. In counts three, four, five and six, he was convicted of oral copulation by force or fear of injury on the victim or another person. In count seven, he was convicted of being an aider and abettor of assault to commit rape.

As discussed by the appellate court, the testimony of the victim was more than sufficient evidence from which to convict Petitioner on all counts. The victim's testimony was not unbelievable, and in fact, was corroborated by numerous witnesses. It was undisputed that the sexual acts took place and that Petitioner transported the victim to the location where the sexual acts took place. Petitioner only disputes that the victim was not forced, but that she voluntarily engaged in the acts. However, the victim testified that she was transported by Petitioner to a

1    garage where she was held by force.  She testified that she was fearful for her life because

2    Petitioner had threatened her, threatened to kill her family, and threatened to harm Samantha.

3    When the victim refused to engage in intercourse with Munoz, Petitioner slapped her across the

4    face.  He also threatened to hit her again and kill her.  Petitioner also took the victim's valuables

5    and sold them.

6        The victim's testimony was corroborated by several witnesses. Detectives found the

7    garage door very difficult to open as the victim had stated.  Melina told one of the detectives that

8    the victim would be in trouble if she did not cooperate with Petitioner.  Samantha told a detective

9    that Petitioner had been mean and yelled at the victim and that the victim did not want to be in

10   the garage and was afraid.  She also corroborated the victim's statements that Petitioner had

11   threatened her and her family, and that the victim had been sexually assaulted.  Gonzales testified

12   that he found the victim crying in the garage, and the victim asked him to take her with him but

13   Petitioner would not allow it.

14       Reviewing the evidence in this case in the light most favorable to the prosecution, it is

15   clear that the state court decision was not contrary to or an unreasonable application of the

16   Jackson standard.  Accordingly, the claim must be rejected.

17       C.  Ground Three

18       Petitioner argues the prosecution failed to prove the elements of kidnapping to commit

19   forcible sex offenses.  As with the previous claims, this claim was presented on direct appeal to

20   the Fifth DCA where it was rejected in a reasoned opinion.  Petitioner then presented it to the

21   California Supreme Court by petition for review, but it was summarily denied.  Therefore, this

22   Court must look through to the Fifth DCA decision.  Ylst, 501 U.S. at 804-05 & n. 3.  The Fifth

23   DCA rejected the claim as follows:

24       *3. Did the prosecutor fail to prove all of the elements of count 2?*

25           Appellant makes a separate argument that the prosecutor failed to prove all of the
         elements of count 2, kidnapping to commit forcible sex offenses. Specifically, he claims
26       there was no evidence presented that appellant intended to commit the sex offenses at the
         time of the kidnapping, and that any subsequent movement of Heather after appellant
27       acquired the requisite intent was not substantial and was merely incidental to the
         commission of each offense. We disagree.

28

1

To be found guilty of aggravated kidnapping under section 209, subdivision (b), the defendant must have the intent to commit a robbery or a forcible sex offense at the time he or she kidnaps or carries away the victim, not after. (*People v. Curry* (2007) 158 Cal.App.4th 766, 779; *People v. Tribble* (1971) 4 Cal.3d 826, 831 .) The jury was instructed on the elements of kidnapping to commit forcible sex offenses, pursuant to CALCRIM No. 1203, as follows:

2

3

4

5

"1. The defendant intended to commit rape or oral copulation. [¶] 2. Acting with that intent, the defendant took, held, or detained another person by using force or by instilling a reasonable fear; [¶] 3. Using that force or fear, the defendant moved the other person or made the other person move a substantial distance; [¶] 4. The other person was moved or made to move a distance beyond that merely incidental to the commission of rape or oral copulation; [¶] AND [¶] 5. The other person did not consent to the movement." CALCRIM No. 1203 further instructs that "substantial distance means more than a slight or trivial distance," and that the movement "must have substantially increased the risk of physical or psychological harm to the person beyond that necessarily present in the rape or oral copulation."

6

7

8

9

10

11

Here, there is sufficient evidence to show that appellant kidnapped Heather with the intent to commit rape or oral copulation when he transported her from the garage to the shelter and back to the garage-clearly a substantial distance. By that time he had already told her that she looked good and that he would have fun with her. He had already assaulted her when he had her tied up, lifted her T-shirt and bra, grabbed her breasts and pinched her nipples. He had also taken her outside and tried to kiss her. Later, Munoz and appellant laughed when they told Heather how they would abduct women, take them to the garage, tie them up, and rape them. In addition, Samantha told Heather that appellant had previously forced her to do sexual acts.

12

13

14

15

16

We reject appellant's claim that the prosecutor failed to prove the elements of the offense.

17

As discussed above by the appellate court, Petitioner was convicted of kidnapping for the

18

purpose of rape or oral copulation.  There was evidence from which the jury could find Petitioner

19

formed the intent to commit forcible sexual acts on the victim when he transported her from

20

Tulare to Porterville.  As noted by Respondent, Petitioner told the victim that she looked good

21

and he was going to have fun with her.  Petitioner had also stated that he had done the same thing

22

to three girls prior to the victim.  Munoz and Petitioner had also joked about abducting women in

23

the past and taking them to the garage where they would tie them up and rape them, much the

24

same way in which the victim was kidnapped and assaulted.  There was also evidence that this

25

same thing had occurred to Samantha, and she admitted as much to the victim.  Thus, there was

26

evidence that Petitioner had intended to transport the victim against her will from Tulare to the

27

garage in Porterville for the purpose of engaging in forcible sexual acts.  Therefore, Petitioner

28

fails to demonstrate that the state court decision was contrary to or an unreasonable application of

1    the Jackson standard.  Accordingly, the claim must be denied.

2

3    IV.    Certificate of Appealability

4          A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

5    district court's denial of his petition, and an appeal is only allowed in certain circumstances.

6    Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining

7    whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

8          (a) In a habeas corpus proceeding or a proceeding under section 2255 before a
      district judge, the final order shall be subject to review, on appeal, by the court
9     of appeals for the circuit in which the proceeding is held.

10         (b) There shall be no right of appeal from a final order in a proceeding to test the
      validity of a warrant to remove to another district or place for commitment or trial
11    a person charged with a criminal offense against the United States, or to test the
      validity of such person's detention pending removal proceedings.
12
      (a)    (1) Unless a circuit justice or judge issues a certificate of appealability, an
13           appeal may not be taken to the court of appeals from–

14               (A) the final order in a habeas corpus proceeding in which the
             detention complained of arises out of process issued by a State
15           court; or

16               (B) the final order in a proceeding under section 2255.

17         (2) A certificate of appealability may issue under paragraph (1) only if the
          applicant has made a substantial showing of the denial of a constitutional right.
18
           (3) The certificate of appealability under paragraph (1) shall indicate which
19        specific issue or issues satisfy the showing required by paragraph (2).

20         If a court denies a petitioner's petition, the court may only issue a certificate of

21   appealability "if jurists of reason could disagree with the district court's resolution of his

22   constitutional claims or that jurists could conclude the issues presented are adequate to deserve

23   encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473,

24   484 (2000).  While the petitioner is not required to prove the merits of his case, he must

25   demonstrate "something more than the absence of frivolity or the existence of mere good faith on

26   his . . . part." Miller-El, 537 U.S. at 338.

27         In the present case, the Court finds that reasonable jurists would not find the Court's

28   determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or

deserving of encouragement to proceed further.  Petitioner has not made the required substantial showing of the denial of a constitutional right.  Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

**ORDER**

Accordingly, IT IS HEREBY ORDERED:

1) The petition for writ of habeas corpus is DENIED;

2) The Clerk of Court is DIRECTED to enter judgment for Respondent and close the case; and

3) The Court DECLINES to issue a certificate of appealability.


IT IS SO ORDERED.

**Dated:**   __**June 6, 2011**__                    _____**/s/ Gary S. Austin**_____
                                                    UNITED STATES MAGISTRATE JUDGE